2025 IL App (2d) 250280-U
Nos. 2-25-0280, 2-25-0281 & 2-25-0282 cons.
Order filed December 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re S.A., D.H., and B.M., Minors | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | Nos. 23-JA-93 |
| | ) | 23-JA-94 |
| | ) | 23-JA-95 |
| | ) | |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee v. Diamond H., | ) | Kathryn D. Karayannis, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding that the State proved by clear and convincing evidence that respondent was unfit for failure to make reasonable progress toward the return of the children was not against the manifest weight of the evidence.  As such, and because respondent does not challenge the best-interest phase of the analysis, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 2    In this case, respondent appeals the trial court's decision finding her unfit for failure to make reasonable progress toward the return of the children.  For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Respondent is the biological mother of C.L. (born April 20, 2010), D.L. (born June 24, 2011), S.A. (born March 2, 2018), D.H. (born November 6, 2020), and B.M. (born January 16, 2023). Only S.A., D.H., and B.M. were named in the instant proceedings. Respondent's parental rights were terminated with respect to S.A., D.H., and B.M. on May 20, 2025. The rights of Brennon A., the biological father of S.A. and D.H., as well as the rights of Bryan M., the biological father of B.M., were terminated in the same proceedings but are not at issue in this appeal.

¶ 5                    A.   THE NEGLECT PETITION

¶ 6    On June 30, 2023, the State filed petitions to adjudicate S.A., D.H., and B.M., alleging that they were neglected minors and that their environment is injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2022)). That same day, the trial court placed S.A. and D.H. in the temporary custody of the Illinois Department of Children and Family Services (DCFS). S.A. and D.H. were placed in the care of respondent's aunt. B.M. was placed in the temporary custody of Bryan M. on June 30, 2023. On July 18, 2023, B.M. was placed in the temporary custody of DCFS. DCFS placed B.M. in the care of his paternal grandmother.

¶ 7    This case originated following a domestic violence incident between respondent and Bryan M. on June 26, 2023. At the time of the incident, respondent was violating an order of protection she had against Bryan M. During the domestic violence incident, B.M. was in the room and S.A. and D.H. were outside unsupervised. Following the incident, police arrived at respondent's home. Respondent resisted arrest, pushing S.A. and D.H. out of her way, and barricaded herself in a neighboring apartment.

¶ 8    A service plan, dated August 7, 2023, was filed with the trial court. The service plan provided that respondent would keep her caseworker informed of her place of residence and contact information, complete an integrated assessment, comply with recommended services,

cooperate with her caseworker, sign all releases of information for service providers, maintain stable housing and employment, and attend drug drops as requested. A permanency goal of return home within 12 months was established.

¶ 9    On September 22, 2023, orders were entered adjudicating S.A., D.H., and B.M. as neglected because respondent failed to protect them from an environment injurious to their welfare.

¶ 10    Respondent completed an integrated assessment with DCFS on October 3, 2023. Of note, respondent had multiple instances of prior contact with DCFS. As a child, respondent was placed in DCFS care due to concerns of physical abuse and neglect. However, when discussing her childhood during the integrated assessment, respondent "stated that she was 'spoiled' and had everything she needed as a child." Additionally, respondent's eldest two children, C.L. and D.L. had lived with their biological father following DCFS involvement. Respondent reportedly struck C.L. with a belt and was involved in a domestic violence incident with Brennon A. During investigations, respondent was not compliant in that she prevented police from seeing her children and kept her children out of school. Another report from January 2023 noted the respondent had a history of domestic violence. In a February 2023 intake, it was noted that respondent was involved in an altercation with Bryan M. and the two had a history of domestic violence. Further, in 2020, DCFS became involved when respondent struck S.A. "in the face with an open hand." DCFS received videos of respondent "cutting her own stomach with a knife" and taking a "handful of white pills." The integrated assessment indicates that respondent was recommended to complete a psychiatric assessment and treatment, engage in individual therapy, complete domestic violence treatment, comply with a substance abuse assessment and treatment, comply with random drug drops, participate in supervised visitation with her children, and complete parenting classes.

¶ 11                          B.  THE PERMANENCY REVIEWS

¶ 12     On October 11, 2023, a Court Appointed Special Advocate (CASA) report was filed in the trial court. The report indicated that the case came into care after a domestic violence incident between respondent and Bryan M. on June 26, 2023. Bryan M. called the police and alleged that respondent had attacked him. The police noted that Bryan had a swollen and red right eye, hair missing from his scalp, and broken eyeglasses. When police went to her residence to arrest respondent, she pushed S.A. and D.H. out of her way before running into a neighboring apartment.

¶ 13     On October 13, 2023, a service plan dated October 3, 2023, was filed in the trial court. The service plan was updated to reflect respondent's completion of the integrated assessment. It required respondent to keep her caseworker informed of her place of residence and contact information, cooperate with her caseworker, sign all releases of information for service providers, maintain stable housing and employment, attend drug drops as requested, complete a psychiatric evaluation with an approved provider, participate in psychotherapy to acknowledge past and present parenting experiences, demonstrate progress in the goals and objectives identified in her mental health treatment plan, and gain knowledge and perceptiveness with how her choices and behaviors put her children's safety, health, and well-being at risk.

¶ 14     That same day, Lutheran Social Services of Illinois (LSSI) filed a dispositional hearing report. It noted that respondent remained in contact with her caseworker but sometimes struggled with appropriate communications. Respondent contacted an advocacy group and reported that her caseworker was not helping her find suitable housing after respondent was evicted from her apartment. However, respondent never informed her caseworker that she had been evicted. Respondent was attending visits with her children. At one point, visitation time was increased.

However, respondent ended a visit early, telling her caseworker that "it was not right that her baby was crying for 2 hours straight." Respondent then accused her caseworker of mistreating B.M.

¶ 15    A dispositional order was entered on October 17, 2023. The trial court found that for reasons other than financial circumstances alone, respondent is unfit and unable to care for, protect, train, educate, supervise, or discipline the minors and placement with her was contrary to their best interests. The trial court also found the service plan appropriate and admonished the parties to cooperate with DCFS, comply with the terms of the service plan, and correct the conditions that brought the minors into care.

¶ 16    On January 31, 2024, CASA filed a report in the trial court. It noted that respondent had begun individual therapy with LSSI and had attended two sessions. The sessions were in the intake stage, so no substantive progress had been made. Although respondent completed a psychiatric evaluation with the Ecker Center, she was informed that she did not meet requirements for their services and none were provided. Additionally, respondent had begun engaging with domestic violence services. She underwent a substance abuse evaluation but was not recommended for treatment.

¶ 17    That same day, a DCFS service plan dated December 5, 2023, was filed in the trial court. Respondent was rated as satisfactory regarding updating her caseworker on employment and place of residence. Her cooperation was rated as unsatisfactory because respondent "ha[d] struggled to remain professional and respectful" when she disagreed with her caseworker. Respondent "continually made allegations against the worker and the agency and continues to threaten lawsuits when she is unhappy with something." Respondent did maintain stable housing and employment and sign all releases of information. Respondent had not yet begun parent coaching.

¶ 18    An LSSI report was additionally filed on January 31, 2024. The report noted an incident following a meeting where respondent was looking at vehicles in the LSSI parking lot. Respondent began taking pictures of an agency vehicle that had been in a car accident. About a week later, respondent texted a picture of the vehicle to her caseworker and asked if it was the reason why her children were late for a visit. She accused the agency of getting into a car accident while her children were in the vehicle and not reporting it to her. Respondent then called the police to take a report of the accident. The police confirmed that no children were in the vehicle at the time of the accident. The report did note that respondent was very consistent with weekly visits. She was attentive to her children and brought gifts, clothes, and food.

¶ 19    Additionally, the report noted that respondent's caseworker had been contacted by the police on December 14, 2023. A detective informed the caseworker that "there had been an incident" between respondent and Bryan M. The caseworker then learned that respondent had offered $3,000 to the brother of Bryan M. in exchange for killing Bryan M. The caseworker was provided with a photo of the text message sent by respondent offering the money to kill Bryan M. The case was later closed without charges. On December 17, 2023, it was reported that respondent was harassing Bryan M.'s mother and his sister, who later obtained orders of protection against respondent. Respondent further sent Bryan M. a text message stating, "I'm killing you bitch that's on my grandma I'll do the time proudly long as u dead I'm gone show u how much I hate u," among other threats. On December 25, 2023, Bryan M. called the police to report that respondent had vandalized his home.

¶ 20    Finally, the report noted that respondent had completed a psychiatric assessment with the Ecker Center on December 11, 2023, and received no treatment recommendations. Due to concerns with respondent's behavior, she was referred for a psychological assessment.

¶ 21 On February 6, 2024, the matter came before the trial court for post-disposition status of services. In an order entered that same day, the trial court noted that respondent's "reports are not great regarding communication and stability." It admonished respondent to do her services, cooperate with the agency, and correct the conditions that brought her children into care. The trial court specifically noted that the parties were "reminded again not to just attend services but to attend them consistently and demonstrate that they have learned from them."

¶ 22 On June 17, 2024, a CASA report was filed in the trial court. The report first noted that respondent had been attending individual therapy, but the sessions were "slow moving." The therapist attempted to get respondent to acknowledge how trauma in her life had impacted her as a parent, but it was difficult for respondent to acknowledge this. Respondent had also been attending domestic violence counseling. She had completed parent education. CASA also reported that the psychological evaluation referral had not yet been approved for respondent, "despite seven months elapsing." Respondent had no obstacles to child visitation. Despite progress in some categories, the report noted that on June 11, 2024, respondent had filed a domestic violence complaint against Bryan M.

¶ 23 On June 18, 2024, a service plan dated June 12, 2024, was filed with the trial court. Respondent continued to keep her caseworker up to date regarding employment and housing. However, it was noted that there continued to be ongoing issues with respect and cooperation between respondent and her caseworker. Respondent was still on a waitlist for her psychological evaluation. Although respondent was attending therapy, it was noted that she was argumentative at times and did not like to delve into her trauma history. She was, however, starting to demonstrate progress in her treatment goals. The agency noted that it had seen "little progress in that being applied to her everyday life and/or actions." Further, the service plan indicated that respondent

"may not have been completely honest" when completing her psychiatric assessment at Ecker Center, in that she reported that she was involved with DCFS due to post-partum depression after the birth of B.M. and Bryan M. had recorded videos of her and submitted them to the court. She was still waiting to undergo a psychological evaluation. Additionally, respondent had completed domestic violence courses and was able to verbalize what characteristics of her previous relationships had been unhealthy. However, she had not verbalized an understanding of how domestic violence in her relationships affects her children. Further, DCFS had set a goal to refrain from further incidents of domestic violence and report domestic violence within 24 hours should it occur. The report noted that there were multiple incidents between respondent and Bryan M. over the reporting period and that respondent had been arrested for domestic battery on March 21, 2024. Respondent completed a second substance abuse evaluation in an attempt to complete her psychological evaluation. The assessment recommended that respondent complete a substance abuse outpatient treatment program. Respondent reported that she would not complete it because her initial evaluation returned no recommendations.

¶ 24    That same day, an LSSI report was filed in the trial court. The report noted that respondent continued to be argumentative with her caseworker and accused the caseworker of having "malicious motives against her." Respondent did attend her weekly visits with her children and completed 8 of 10 random drug drops. She had also successfully completed parenting classes.

¶ 25    A permanency order was entered by the trial court on June 24, 2024. The court found that the appropriate permanency goal was return home within 12 months. The trial court did not make a finding regarding reasonable effort or substantial progress. It did note in the order that respondent was "making some efforts and some progress." It was noted that while respondent had been consistent in therapy, she had not made progress in discussing her own past trauma.

¶ 26    On August 23, 2024, a CASA report was filed in the trial court. Respondent continued to attend therapy but still struggled to make progress in her treatment goals. She had not yet been able to undergo a psychological evaluation. However, she had completed her domestic violence courses.

¶ 27    On August 29, 2024, Roan Solutions filed in the trial court a discharge report. The report detailed respondent's progress and successful discharge from parenting classes.

¶ 28    That same day, an LSSI report was filed in the trial court. The report noted that respondent had moved and kept her caseworker informed of the move. Respondent continued to attend weekly visits and the quality of the visits had improved. Additionally, respondent was discharged from individual therapy. The therapist noted that respondent, "in spite of understanding her goals of treatment, resisted resolving it." In June of 2024, respondent requested a new therapist, alleging that her current therapist was "rude, disrespectful, and never let her talk in sessions." She also alleged that her therapist was submitting false reports "and did not have professional intentions towards her." Respondent was reassigned to a new therapist. Respondent had completed her psychological evaluation, but results were still pending.

¶ 29    The matter came before the trial court on September 3, 2024. The trial court noted that respondent had completed a substance abuse assessment, psychiatric evaluation, and psychological evaluation. Her individual therapy had been on hold due to respondent requesting a different therapist but was set to resume. The trial court did note concern due to the repeated incidents of domestic violence between respondent and Bryan M.

¶ 30    On December 10, 2024, a service plan dated December 3, 2024, was filed in the trial court. The plan noted that respondent had refused to sign a release of information for the Ecker Center to share reports with DCFS regarding dialectical behavior therapy (DBT) respondent was set to

begin. Further, respondent's progress in mental health treatment was rated as unsatisfactory. Respondent had been assigned a new therapist after reporting that her initial therapist was "disrespectful and making up lies." When respondent began sessions with a new therapist, her progress stagnated when the therapist began exploring the reasons this case came into care. Respondent again requested to change therapists. Additionally, after respondent's psychological evaluation, she was recommended to complete DBT in an individual and group setting. She was rejected from group therapy because "it was clear to the provider that she was not interested in completing services and was just trying to check a box for court." This caused the provider concern that respondent "would disrupt the progress of other group participants."

¶ 31    That same day, an LSSI report was filed in the trial court. The report indicated that respondent's psychological evaluation had been completed. Of note, respondent told the evaluator that her case came into care because "her 'ex' somehow got an Order of Protection she had against him reversed to be an Order of Protection against her." Respondent stated that all the allegations against her are false and she does not know why her case is still active. Respondent was diagnosed with borderline personality disorder with narcissistic traits. It was noted that her "thoughts were logical in that they consistently demonstrated an excessively positive portrayal of herself, and a denial of any negativity associated with her." However, "her thoughts were so grandiose and so self-inflated that they broke with reality when compared with the incidents described in DCFS records." Additionally, the evaluator reported that the safety risks to the minors should they be returned to respondent's care "include exposure to domestic violence, acts of self-injurious behavior, exposure to dangerous paramours, and chronic emotional instability" and that respondent "appears to lack empathy for the children." The LSSI report also noted that despite successfully completing parenting classes, respondent was not recommended to complete a parenting capacity

assessment. This is because respondent continually provided inconsistent information and would potentially threaten the testing provider if she did not agree with the assessment results. It was noted that after respondent received the results of her psychological evaluation, the provider received multiple threatening phone calls from respondent. Due to the continued threats and inappropriate calls from respondent, that provider will no longer complete testing for DCFS.

¶ 32    The LSSI report also noted difficulties respondent was facing with therapy. Respondent began therapy with a new provider, Perspectives Counseling, in August 2024. She engaged in therapy there until November 2024. Although respondent initially was compliant in therapy, she was not open to conversations about past trauma. She became accusatory towards the therapist and accused the therapist of lying, bias, and acting unprofessionally. At the last session, respondent continued to deny all DCFS allegations and revoked her release of information.

¶ 33    On December 11, 2024, CASA filed a report in the trial court. The report noted that respondent denied a history of domestic violence with previous romantic partners and could not explain why her children were in DCFS care. Respondent referred herself to therapy at NICASA. However, NICASA explained they are not the appropriate resource for her mental health needs and agreed to provide therapy for a maximum of six months until a DBT-trained therapist is located.

¶ 34    The trial court entered a permanency order on December 18, 2024. The court changed the permanency goal to substitute care pending termination of parental rights and found that respondent had not made reasonable efforts or substantial progress towards returning the minors home. As support for its findings, the trial court stated that respondent had engaged in services but was not aware why her children were in care and believed everyone was against her. She was in individual therapy at multiple locations and did not make progress. She was unsuccessfully

discharged from therapy. The court noted that although respondent completed substance abuse counseling, domestic violence counseling, and parenting courses, its biggest concern was with her mental health.

¶ 35                          C.  THE TERMINATION PROCEEDINGS

¶ 36    On December 26, 2024, the State filed a petition for termination of parental rights with respect to S.A. and D.H. The petitions alleged that respondent was unfit because she: (1) failed to maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failed to protect the children from conditions within their environment injurious to the children's welfare (750 ILCS 50/1(D)(g) (West2024)); (3) failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children from her during the nine-month period between September 23, 2023, and June 23, 2024 (750 ILCS 50/1(D)(m)(i) (West 2024)); and (4) failed to make reasonable progress toward the return of the children to her during the nine-month period from September 23, 2023, through June 23, 2024 (750 ILCS 50/1(D)(m)(ii) (West 2024)). On March 24, 2025, the State filed a petition for termination of parental rights with respect to B.M., asserting the same four grounds of unfitness as the petitions for S.A. and D.H.

¶ 37                              1. Unfitness Hearing

¶ 38    The unfitness phase of the proceedings to terminate respondent's parental rights commenced on April 14, 2025. At the outset, the trial court took judicial notice of the following: the minors' birth certificates; the adjudicatory orders; the October 17, 2023, dispositional order; the permanency orders of June 24, 2024, and December 18, 2024; the family service plans; psychological reports; mental health assessments; the integrated assessment; the Roan Solutions discharge report; visitation plans; police reports; and therapy reports.

¶ 39 The State's first witness was Blanquita De Loera, a clinical therapist with Perspectives Counseling. De Loera testified that she received respondent's referral in August 2024. Respondent was referred by LSSI. De Loera indicated that respondent's children came into care due to several risk factors noted in the referral, including domestic violence, inadequate supervision, physical abuse toward one child, and mental health.

¶ 40 De Loera testified that the two met for individual sessions from August 2024 to November 2024. At first, respondent was very cooperative and excited to participate in treatment. During these sessions, De Loera was focused on building rapport with respondent. However, when the sessions began to focus on respondent's therapeutic goal to understand and acknowledge the risk factors that led to her children being removed from her care, respondent stopped making progress. Ultimately, De Loera testified that respondent did not meet the goal. She believed respondent's mental health symptoms impacted her ability to make progress towards that goal. As the sessions progressed, respondent became "emotionally dysregulated, combative, argumentative, [and] very distrustful." If De Loera attempted to review respondent's integrated assessment or the police reports filed, respondent would state that she was "triggered" by the content. Later, she would deny having experienced symptoms of trauma. Respondent also could not articulate how domestic violence put her children at risk. She refused to discuss the matter and denied that her children had been present during incidents of domestic violence. De Loera testified that her services with respondent ended when she attempted to review her therapy report with respondent. Respondent became "combative," stating that De Loera was discriminating against her and threatening to sue De Loera. The situation became "uncomfortable" and led De Loera to terminate the session.

¶ 41    De Loera recounted some strengths respondent presented in their sessions. She noted that respondent was available and always willing to schedule. She was attentive to her children's strengths and spoke highly of them.

¶ 42    The State next called respondent to testify. Respondent testified that she is mother to five children. She stated that the two oldest, C.L. and D.L., are 14 years old and 13 years old respectively. Respondent claimed that C.L. and D.L. lived with her aunt, as they were supposed to live with their father but he "is a deadbeat." Respondent stated that in 2021, C.L., D.L., S.A., and D.H. were removed from her care due to domestic violence between her and Brennon A. She testified that she only had one experience of domestic violence with Brennon A. She stated that she could not recall if Brennon A. had been convicted of domestic battery against her in 2019. She could not recollect any allegations of physical abuse toward C.L.

¶ 43    Regarding the incident that led to S.A., D.H., and B.M. being removed from her care, respondent testified that there was an incident of domestic violence between her and Bryan M. She stated that he struck her in the nose and she contacted the police. She also reported that Bryan M. grabbed her by the throat. Respondent testified that her children were not present during this incident but were with her aunt. However, she also alleged that she was not violating the order of protection between her and Bryan M. because it allowed parenting exchanges, and that's why she was at his home. When questioned why she was at Bryan M.'s home for a parenting exchange if the children were with her aunt, respondent stated that "the children were dropped off after the incident" and did not elaborate. Respondent alleged that this was the only time she and Bryan M. were involved in a domestic dispute.

¶ 44    Respondent recalled that she was required to complete several services to be reunited with her children. She claimed that as the case continued, her caseworkers "kept continuously adding

services no matter what." She believed that her caseworkers were "out to get her" from the start because she voiced concerns about her children being involved in a car accident in an agency vehicle. She asserted that the foster parents of S.A., D.H., and B.M. reached out to her wondering why the children returned from their visit hours late and "hysterical."

¶ 45    Regarding her services, respondent testified that she completed domestic violence services at Community Crisis Center. She reported that Community Crisis Center was not biased. According to respondent, whether a provider was biased depended on if her caseworkers had built a relationship with the provider prior to her sessions.

¶ 46    With respect to her mental health, respondent denied ever receiving a diagnosis of PTSD. She further stated she had never been diagnosed with bipolar disorder and did not recall telling the Ecker Center that she had previously been misdiagnosed with bipolar. She testified that prior to the case, she had never been diagnosed with any mental health condition. She worked as a certified nursing assistant (CNA), and as a CNA she could not have any mental health diagnoses. Respondent additionally testified that she did not believe that the psychologist performing her psychological evaluation had any intention of conducting a thorough examination. Respondent stated she could tell by the psychologist's body language. Respondent stated that the examination was "a bunch of puzzles, words, things she just was throwing in front of me and picking back up as she was going." Respondent was required to read passages and answer questions at the end, "like little tests." Respondent believed that the examination was 20 minutes.

¶ 47    Prior to attending therapy with De Loera, respondent recalled attending therapy sessions with Cristina Maria. Respondent testified that they never worked on her therapy goals in those sessions. She requested a new therapist when Maria told her that she needed to learn how to "kiss butt." At some point after her sessions with Maria ended, respondent protested outside of the LSSI

offices. She stated she protested because she "felt lost" and "couldn't go to the media like [she] wanted to." Respondent testified that she threatened her caseworkers with lawsuits because they were "very unprofessional." She also threatened to sue the psychologist who performed her psychological evaluation, De Loera, and the police officers that arrested her.

¶ 48 Respondent additionally testified that she attended parenting classes at Roan Solutions. She denied that she told Roan that her ex-boyfriend had put his hands on her in front of her children. She did recall telling them that Bryan M. had pushed her head into a staircase. She contended this incident was part of the same altercation that led to the case coming into care. She could not recall the last time she spoke with Bryan M.

¶ 49 On cross-examination by counsel for Bryan M., respondent testified that she recalled a second incident where Bryan M. assaulted her. She stated that it happened very recently, but she could not remember exactly when. She then stated that it had happened a while back. Respondent alleged that Bryan M. gave her a black eye during this altercation. Respondent testified that this incident occurred when she was at Bryan M.'s residence.

¶ 50 Bryan M. was next called by the State. Bryan M. testified that he is the father to three children, Ky. M., Ki. M., and B.M. Respondent is the mother to only B.M. Ky. M. and Ki. M. live with their biological mother and DCFS has never been involved in their care.

¶ 51 Regarding B.M., Bryan M. testified that the minor was taken into protective custody due to a domestic violence incident in June 2023. Bryan M. testified that at the time he and respondent had an open case in the family court system for parenting time with B.M. That day, he had picked up the children from his aunt's house, went back to his residence, and an argument ensued. Bryan M. indicated that at that point, he contacted Uber to transport respondent home, but she did not want to get into the vehicle. Respondent was standing outside his door with S.A., D.H., and B.M.

Bryan M. recalled that it had begun to rain, so he brought B.M. inside. Respondent followed him in, and when Bryan M. placed B.M. on the couch, respondent "started swinging." Respondent made physical contact with Bryan M. He testified that at this time, B.M. was present in the room and S.A. and D.H. were playing outside.

¶ 52   Bryan M. further testified that he had custody of B.M. at the outset of the case, but B.M. was moved to a foster placement after Bryan M. was arrested with a firearm. He indicated that he previously had a concealed carry license, but the license was revoked due to an order of protection. He had forgotten that he kept a firearm in his vehicle and was arrested for keeping a firearm in the glovebox of his vehicle without a valid license.

¶ 53   Bryan M. recalled an instance in December 2023 when he was contacted by the police. He was informed at the time that respondent had contacted his brother, who had mental disabilities, and offered to pay him to kill Bryan M. Later that month, on Christmas Day, Bryan M. called the police because respondent was sending him threats and damaged his property. He recalled seeing respondent on his video-enabled doorbell and observed her put a red, sticky substance on his door. She also damaged his door handle. He recalled that while he was at his family's house for Christmas, respondent texted him threats that she was going to kill the mother of his other children, shoot Bryan M., and shoot his mother. She stated that she would "do time proudly" as long as Bryan M. was dead.

¶ 54   Bryan M. recalled another altercation between him and respondent on March 19, 2024. Bryan M. stated that the two had gone to a restaurant on a date. They had a disagreement while at dinner and Bryan M. left to go home. When he got home, respondent was at his house and threw something out of his window. He got in his car and left.

¶ 55    In April 2024, respondent appeared at Bryan M.'s workplace because he was supposed to give her a title to a car. While he was talking to respondent, she stabbed him with an unknown object. Bryan M. testified that he called the police and respondent was arrested. He believed that the case was ultimately dismissed.

¶ 56    In June 2024, Bryan M. was arrested for the incident in March 2024. He stated that respondent claimed that Bryan M. punched her when she was at his house. Bryan M. testified that he did not punch respondent. That same month, Bryan M. was served with an order of protection respondent entered against him. Despite this, Bryan M. testified that respondent continued to contact him "[a] lot." He estimated that she called him around five times. She has also appeared at his home, which he saw on the video doorbell footage.

¶ 57    Bryan M. further testified that throughout the case he engaged in domestic violence courses. He identified that he had learned to create boundaries to avoid conflict. With respect to respondent, this meant he needed to "[s]top the unnecessary contact." He made police reports when respondent continued to contact him.

¶ 58    On cross-examination by counsel for respondent, Bryan M. testified that he never witnessed respondent abuse the children. On cross-examination by his own counsel, Bryan M. testified that he pleaded guilty to the charges that arose from the March 2024 altercation. His gun charges were dismissed. He explained that he did not fight the last order of protection entered against him because he did not want to have contact with respondent.

¶ 59    On redirect examination, Bryan M. explained that he pleaded guilty to the charges based on the March 2024 altercation because of new charges against him. He explained that respondent reported that he had threatened to kill her if she did not drop the charges against him.

¶ 60      The State next called Julie Traskaski, a parent support specialist with Roan Solutions. Traskaski testified that she facilitated the parenting group respondent engaged in as well as respondent's one-on-one parenting. Traskaski stated that she spoke with respondent regarding why her children had come into care. Respondent stated it was because "her ex had put his hands on her *** in front of her children." Traskaski documented this explanation at the time.

¶ 61      Traskaski indicated that at the beginning of her sessions with respondent, the two encountered scheduling issues and misunderstanding. When this happened, respondent accused Traskaski of discriminating against her and acting unfairly.

¶ 62      On cross-examination by respondent's counsel, Traskaski clarified that respondent did successfully complete parenting classes. She stated that respondent participated and "absolutely showed up."

¶ 63      The State also called Faith Cavender, respondent's caseworker, to testify. Cavender was assigned to respondent's case on July 14, 2023. She recalled that the case came into care after there was a domestic violence incident between respondent and Bryan M. During the incident B.M. was inside the room and S.A. and D.H. were outside unsupervised. When police arrived at respondent's residence later that day to arrest her for violating an order of protection, she pushed S.A. and D.H. out of her way and barricaded herself in a neighbor's apartment.

¶ 64      Cavender testified that respondent completed an integrated assessment in August 2023. Based upon the integrated assessment, respondent was recommended to complete a substance abuse evaluation, a psychiatric evaluation, parenting education and coaching, domestic violence courses, and individual therapy. Respondent completed random drug drops, which were negative for the presence of drugs. She also successfully completed parenting classes and domestic violence counseling.

¶ 65    Cavender stated that respondent had completed a psychiatric assessment as recommended in October 2023 at the Ecker Center. When the psychiatric examination yielded no treatment recommendations, the agency referred respondent to obtain a psychological assessment. At some point after the psychological evaluation, respondent sought a second psychiatric evaluation to replace the results of the psychological evaluation. Cavender explained that she referred respondent to a psychological evaluation based upon concerning behavior by respondent. She noted that one day when respondent was unhappy with her services, respondent began sending text messages to Cavender alleging that respondent's children were in an agency vehicle when it was involved in a car accident. When Cavender stated that respondent's children were not in the car at the time of the accident, respondent called the police to take a report.

¶ 66    After the psychological evaluation, respondent was diagnosed with borderline personality disorder with narcissistic traits. She was recommended to attend DBT therapy. Respondent was referred to Family Counseling Service for a DBT group. However, respondent could not start therapy there. When she did not hear back about the referral within a week, respondent called the Family Counseling Service offices and accused them of lying to her and being dishonest about the therapy. She accused the supervisor of "being in cahoots with DCFS and working against her." She also told the supervisor that "she just wanted to get it done and she was required to engage due to court and it was clear she didn't have much willingness to engage." As a result, the supervisor told respondent she was not appropriate for the program because it was "voluntary and they were concerned that if she was just there to check a box, she would disrupt the rest of the group who were choosing to be there and wanting to make progress."

¶ 67    Cavender further testified that throughout the case, communication with respondent was difficult. At times, respondent "could be completely appropriate and respectful." However,

"probably 75 percent of the time there was some sort of accusatory tone" telling the agency that they "were biased against her, discriminating against her, working with providers who were also biased." At no time did respondent acknowledge any reason on her behalf that her children were in care.

¶ 68    Cavender testified that respondent was in contact with the agency throughout the case. She would bring items to her visits, including clothes, toys, and food. Nonetheless, Cavender expressed safety concerns if the children were returned to respondent's care due to respondent's stability and mental health and her ability to provide a safe environment for her children. Cavender noted that respondent demonstrated instability by calling the police to visits and reporting abuse towards her children in care. She noted that on one occasion, respondent called the police because she showed up late for a visit and the children were no longer there. Additionally, respondent continued to engage with Bryan M. and there were repeated instances of domestic violence throughout the pendency of the case.

¶ 69    On cross-examination by respondent's counsel, Cavender stated she was unaware that the order of protection in place in June 2023 allowed the parties to communicate for parenting time drop-offs and pick-ups. Additionally, the criminal charges against respondent based on the June 2023 domestic violence incident were vacated. Cavender also testified that she believed respondent's parental rights should be terminated.

¶ 70    Respondent then testified in her case in chief. Regarding the incident that brought her children into care, respondent testified that the State was incorrect and S.A. and D.H. were inside, not outside. She further alleged that it was just her and her children present, Bryan M. was not there.

¶ 71    Respondent also testified that she underwent a psychiatric evaluation in October 2024 and was not recommended any follow-up treatment. Additionally, she was enrolled in nursing school at Harper College, and to enroll she needed to pass a psychological evaluation. Respondent alleged that she had received an updated psychological examination after the DCFS psychological. The individual who performed her follow-up psychological told her that the DCFS psychological was "inappropriate" and disagreed with the results. The results of her second psychological were that she was a fit parent and that her caseworker "has a personal vendetta against" her.

¶ 72    On cross-examination by the State, respondent indicated that her children were not with her at the time of the domestic violence incident with Bryan M.

¶ 73    On May 20, 2025, the court rendered its decision, finding that the State met its burden of proving respondent unfit on all four counts alleged in each petition for termination of parental rights. In issuing its oral ruling, the trial court specifically noted that it found all the State's witnesses, except for respondent, to be credible. The trial court stated that respondent's testimony was not credible and based this upon "her manner while testifying" which was at times as if "she was being put off by being asked questions" and "like she didn't care about the questions." Further, respondent's testimony was full of "repeated inconsistencies" that were "clearly rebutted by exhibits and witnesses who had no reason to misrepresent the facts of the case."

¶ 74    The trial court found that respondent "showed no reasonable degree of interest, concern, or responsibility for the children, and she failed to protect them from conditions in their environment which were injurious to their welfare." It noted that while respondent clearly loved her children, that in itself was not sufficient to show interest, concern, or responsibility. Respondent testified that there was only one instance of domestic violence between her and Brennon A. and one or two instances of domestic violence between her and Bryan M. However,

the record showed multiple instances of domestic violence between her, Brennon A., and Bryan M., including verbal and physical arguments, threats, stabbing, and pulling of hair. The reports also indicate that respondent was uncooperative and that her children were present for these instances of domestic violence. Respondent's testimony regarding the June 2023 domestic violence incident was further lacking in credibility given that respondent stated that the incident occurred during a pickup and drop-off of the children, and she was thus not violating her order of protection, but also that the children were not present because they were with her aunt.

¶ 75    The trial court further identified that respondent did make some efforts and some progress, but it was neither reasonable nor substantial. It noted that respondent attempted to hire Bryan M.'s mentally handicapped brother to kill him, and sent threats to kill Bryan M., his mother, and sister. It stated that respondent's statement that she would be happy to serve time as long as Bryan M. was dead was not indicative of interest, concern, or responsibility for her children's welfare.

¶ 76    The court noted that after respondent completed the integrated assessment, she was recommended to complete a substance abuse evaluation, a psychiatric evaluation, domestic violence services, and parenting classes. She testified that her caseworkers never treated her appropriately and kept adding services. However, the only additional service added was a psychological evaluation. The psychological evaluation was added due to respondent's repeated allegations that everyone was biased and prejudiced against her, as well as the allegations that her children were in an undisclosed car accident. When respondent received her psychological evaluation in August 2024, she reported that she did not understand why her children came into care.

¶ 77    Although respondent completed her parenting classes and domestic violence courses, the trial court emphasized that she did not make substantial progress, especially with respect to her

domestic violence services. She "did not make progress in learning to stay away from the abuse or the effect it had on her children[,] as she continually returned and was abused" by Bryan M. Respondent was discharged unsuccessfully from two therapists and despite the treatment goal of understanding and acknowledging the risk factors that led to the children being removed from her care, respondent was unable to articulate how domestic violence put her children at risk. Respondent was additionally denied a referral to a DBT therapy group because she indicated she was only there to "check boxes" and was not interested in participating.

¶ 78    Upon finding respondent unfit, the court proceeded with the best-interest phase of the termination proceedings. The trial court found it in the best interest of S.A., D.H., and B.M. to terminate respondent's parental rights. This appeal followed.

¶ 79                                    II. ANALYSIS

¶ 80    At the outset, we note that throughout her brief, respondent cites to actual cases with fictitious quotes and holdings.

¶ 81    Her first fictitious quote is *In re Brianna B.*, 334 Ill. App. 3d 651, 657 (2002), asserting that "[a] parent is not required to parrot the agency's exact narrative." In *Brianna B.*, the appellate court affirmed a trial court ruling that the respondent parents did show a reasonable degree of interest in the minor child. *Id*. at 659. *Brianna B.* never addresses, as respondent contends, whether the parent agreed with the agency's stated reason for the child coming into care.

¶ 82    Next, respondent cites a fictitious quote from *In re A.S.*, 2014 IL App (3d) 140060, ¶ 27, stating that "Reasonable progress does not require complete agreement with the Department's version of events." In *A.S.*, 2014 IL App (3d) 140060, ¶ 14, the respondent mother argued generally that the trial court erred in finding her unfit but did not dispute the reasons that her children came into care. She additionally argued that the trial court erred in starting the relevant 9-month period

when the children were adjudicated and in not letting her present certain evidence at the unfitness hearing and considering evidence of her drug drops. *Id*. ¶¶ 21, 27, 29, 34. Again, at no time did the respondent mother argue with the Department's version of events.

¶ 83    Respondent's next fictitious quote is attributed to *In re J.L.*, 236 Ill. 2d 329, 345 (2010) for the proposition that "Parents may dispute details of the incident while still making progress toward correcting the conditions that led to removal." In *J.L.*, 236 Ill. 2d 329, 343, our supreme court considered whether the Act created a legal basis for the conclusion that time spent in prison tolls the nine-month period during which reasonable progress must be made. It did not address whether the details of the incident that brought the children into care were disputed, as respondent claims.

¶ 84    Finally, respondent draws a fictitious conclusion from *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001), proposing that the decision to terminate one's parental rights cannot "rest on a parent's personality traits or imperfect cooperation unless those conditions prevent the parent from safely parenting and remain unaddressed despite reasonable opportunity." In *M.A.*, 325 Ill. App. 3d at 392, the child was taken into care due to a lack of care, an injurious environment, and being born exposed to drugs. The trial court terminated the respondent mother's parental rights because she failed to make reasonable progress when she continued with criminal activity after the child was adjudicated neglected, became incarcerated for a number of years, and failed to complete any services while incarcerated. *Id*. At no time did the case involve whether the respondent's case involved a conflict of personalities or "imperfect cooperation" as respondent asserts.

¶ 85    Respondent's fictitious language was likely hallucinated by artificial intelligence (AI). The Illinois Appellate Court, Fourth District, recently considered this issue, stating:

> "[T]he Illinois Supreme Court AI policy explicitly permits the use of AI. However, attorneys must use AI tools wisely. We reiterate the supreme court's reminder that

'[a]ll users must thoroughly review AI-generated content before submitting it in any court proceeding to ensure accuracy and compliance with legal and ethical obligations.' [Ill. Sup. Ct., Illinois Supreme Court Policy on Artificial Intelligence (Jan. 1, 2025), https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/e43964ab-8874-4b7a-be4e-63af019cb6f7/Illinois% 20Supreme% 20Court% 20AI% 20Policy.pdf [https://perma.cc/WCE6-WZE5]]. Flagrant and unprincipled use of AI without ensuring the accuracy of the generated response 'is an abuse of the adversary system' (*Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 461 (S.D.N.Y. 2023), as it wastes court resources that would be better spent elsewhere." *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 131.

¶ 86    Rule 375(a) states as follows:

"If after reasonable notice and an opportunity to respond, a party or an attorney for a party or parties is determined to have willfully failed to comply with the appeal rules, appropriate sanctions may be imposed upon such a party or attorney for the failure to comply with these rules. Appropriate sanctions for violations of this section may include an order that a party be barred from presenting a claim or defense relating to any issue to which refusal or failure to comply with the rules relates, or that judgment be entered on that issue as to the other party, or that a dismissal of a party's appeal as to that issue be entered, or that any portion of a party's brief relating to that issue be stricken. Additionally, sanctions involving an order to pay a fine, where appropriate, may also be ordered against any party or attorney for a party or parties." Ill. S. Ct. R. 375(a) (eff. Feb. 1, 1994).

¶ 87    Respondent's use of fictitious quotations from actual cases violates our supreme court rules and could be grounds for striking and dismissing her appeal. See *Pletcher v. Village of Libertyville Police Pension Board*, 2025 IL App (2d) 240416-U, ¶ 29 (granting appellee's request to strike appellant's brief and dismiss the appeal where *pro se* appellant cited to fictitious cases and fictitious quotes from real cases). However, because a biological parent's right to raise his or her child is a fundamental liberty interest and involuntary termination of parental rights is a drastic measure *(In re Gwynne P.*, 215 Ill. 2d 340, 353 (2005)), we will address the arguments of respondent on the merits. *In re C.R.*, 2024 IL App (4th) 231441-U, ¶ 20 (addressing termination on the merits despite briefing failures); see also *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 30, (trial error found forfeited but still addressed on the merits).

¶ 88    On appeal, respondent argues that the trial court erred in granting the State's petition for termination of parental rights with respect to its finding that respondent failed to make reasonable progress toward the return of the children during the nine-month period from September 23, 2023, through June 23, 2024. Specifically, respondent argues that the trial court's findings were against the manifest weight of the evidence because: (1) respondent "repeatedly and consistently articulated a clear understanding of the circumstances surrounding removal;" (2) her disagreement with mental health diagnoses did not equate to a failure to acknowledge responsibility; (3) she completed a significant number of services and demonstrated behavioral change; and (4) the trial court "improperly substituted a subjective psychological interpretation for evidence-based progress."

¶ 89    The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2024)) sets forth a two-stage process for the involuntary termination of parental rights. *In re Keyon R.,* 2017 IL App (2d) 160657, ¶ 16. Initially, the State has the burden of proving by clear and convincing evidence that

the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). See 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). On appeal, this court will not disturb a trial court's finding with respect to parental unfitness or a child's best interest unless it is against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 90 Respondent alleges that the trial court erred in finding her unfit pursuant to section 1D(b)(m)(ii) of the Adoption Act. That section provides that a parent may be found unfit for failure "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1D(b)(m)(ii) (West 2024). Reasonable progress "is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *Id*.

¶ 91 Respondent first argues that the record reflects that she "did acknowledge: that a domestic-violence incident occurred, that the children were affected by the instability associated with domestic violence, and that she needed to improve her parenting skills, emotional regulation, and communication." The record clearly contradicts this claim. While respondent at times

acknowledged that the incident came into care after a domestic violence incident, such as during her intake with Traskaski, she later contradicted those statements and testified that her children were not present at the time the June 2023 domestic violence incident occurred. She also testified that she either did not recall certain domestic violence incidents or that those incidents never occurred, despite being backed up by police reports and criminal convictions. Further, respondent was discharged from two therapists and never made progress with either in understanding how her decisions impacted her children. When she underwent a psychological evaluation over a year after the case came into care, she still reported that she did not know why her children were in care.

¶ 92     Respondent next argues that "a parent's disagreement with some aspects of the narrative does not equal a failure to acknowledge responsibility." She argues that "Illinois law is explicit a parent is not required to admit every allegation, nor to concede to the correctness of every agency interpretation, to demonstrate progress." Even if we agree with the proposition that a "parent's disagreement with some aspects of the narrative does not equal a failure to acknowledge responsibility," we find that contention meritless here. In this case, respondent did not just disagree with the reason her children came into care. Rather, the record reflects that she repeatedly demonstrated that she did not understand why her children came into care and failed to make progress in understanding how domestic violence affected her children. Accordingly, respondent failed to address the major concerns raised by DCFS, not just "peripheral details" as she attempts to argue.

¶ 93     Next, respondent argues that the "trial court's reliance on 'failure to acknowledge' ignores [respondent's] significant service completion and behavioral change." In support, she notes that she completed most of her services, including parenting classes, domestic violence services,

psychiatric and psychological evaluations, visitation, drug screens (which were negative), and tasks associated with stable housing and employment.

¶ 94    While respondent did complete some services, the record demonstrates that she did not make "measurable or demonstrable movement toward the goal of reunification." *Daphnie E.*, 368 Ill. App. 3d at 1067. Here, respondent completed a psychiatric evaluation, but the information provided about the evaluation shows that she was likely dishonest with the details she provided to the evaluator. When she was referred for a psychological evaluation due to continued concerns about her mental health, respondent tried to replace her results with different evaluations. Respondent was also unsuccessfully discharged from multiple therapists because she began to act combatively when the therapists attempted to make progress on the goals of understanding why her children came into care and the effects exposure to domestic violence could have on her children. Respondent was declined a referral into a DBT group because she made it clear she was not interested in truly participating but only wanted to "check boxes" to finish the case. Further, although respondent completed domestic violence services, her continued conflict with Bryan M. throughout the pendency of this case demonstrates that she did not make progress from the conditions that brought her children into care.

¶ 95    Finally, respondent argues that the trial court "improperly substituted a subjective psychological interpretation for evidence-based progress." The record belies respondent's claims that the "court relied heavily on a single evaluator's interpretation of [respondent's] mental-health presentation." Rather, the trial court clearly indicated that it found each of the State's witnesses credible except for respondent. Here, there were several instances where respondent failed to make progress. Her therapists testified that there was conflict when they tried to address the reasons why

the minor children were brought into care and Bryan M. testified about the domestic violence incidents between the two while the case was pending.

¶ 96    Respondent cites *In re K.E.S.*, 2018 IL App (2d) 170907, for the proposition that "a mental-health [*sic*] diagnosis is not evidence of parental incapacity, nor does it eliminate the parent's right to the State's reasonable efforts." We find *K.E.S.* distinguishable. In *K.E.S.*, 2018 IL App (2d) 170907, ¶ 28, the respondent mother was diagnosed as suffering with bipolar disorder and PTSD. The trial court eventually found the respondent unfit, stating that she "suffers from severe mental health issues," despite making "evident" progress. *Id.* ¶ 43. The appellate court reversed, finding that "[n]one of the evidence regarding [the respondent's] condition at the time of the dispositional hearing demonstrated" that the respondent was unable to care for the minor child. *Id.* ¶ 64. Additionally, the appellate court found that the "evidence was uncontradicted that [respondent] had diligently complied with all aspects of her service plan and had corrected all of the conditions that caused [the minor] to be removed from her care." *Id.*

¶ 97    In the present situation, respondent failed to correct the conditions that brought her children into care and she did not diligently comply with the aspects of her service plan. Rather, respondent refused to cooperate with aspects of the service plan she disagreed with and continued to engage in domestic disputes with Bryan M.

¶ 98    Based on the foregoing, we cannot say that the trial court's determination that respondent was unfit for failing to make reasonable progress was unreasonable, arbitrary, or not based on the evidence. As such, and because respondent did not appeal the trial court's decision that it was in the minor's best interest that her parental rights be terminated, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 99                                    III. CONCLUSION

¶ 100   For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 101   Affirmed.